**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

GREGORY GORECKI,
individually, and on behalf of all
others similarly situated,

        Plaintiff,

vs.                           CASE NO.:  21-cv-01023 MSS/JSS

GRAND DESIGN RV, LLC,

        Defendant.

_____/

**PLAINTIFF'S OPPOSITION TO DEFENDANT GRAND DESIGN**
**RV, LLC'S MOTION TO DISMISS PLAINTIFF'S**
**SECOND AMENDED COMPLAINT**

      Plaintiff Gregory Gorecki ("Plaintiff") submits this Memorandum of Law in

Opposition to Defendant Grand Design RV, LLC's Motion to Dismiss Plaintiff's

Second Amended Class Action Complaint ("Motion" or "MTD").

## I.    INTRODUCTION

      Defendant Grand Design RV, LLC ("Grand Design") publicly brands itself as

a company whose culture necessitates a long-term, personal connection with

customers, employees, and dealers, which boasts a class-leading warranty, which

raises the quality bar through superior service and an experienced work force with

a customer focus, and which has a business model of "doing the right thing."[1]

Despite these grandiose claims, Grand Design privately embraces an altogether

---

[1] https://www.granddesignrv.com/our-story (last visited Sept. 28, 2021).

different approach—systematically denying warranty coverage and failing to provide customers with a cure for the well-known water intrusion issues caused by its Slide-Box Exterior Seal Defect (the "Defect"), and routinely blaming customers for its own failures. MTD at 4-5. In reality, Grand Design knows that the Defect is related to poor materials, poor manufacturing processes, and/or a design defect. Grand Design compounds that failure by refusing to properly repair the Defect. Second Amended Complaint ("SAC") at ¶ 12. As Grand Design well knows, Plaintiff's water intrusion frustrations are neither new, nor unique. SAC at ¶¶ 32-53. Plaintiff's operative Complaint is replete with allegations from dozens of customers having difficulties managing and controlling water intrusion caused by the Defect, including visible water intrusion, and in some instances pink discoloration in the flooring. *Id*. Regardless of how the water intrusion manifests, all water intrusion complaints seem to relate to the common Defect.

Notably, Plaintiff and Grand Design agree on one premise: in early 2017, Grand Design received four consumer complaints concerning water intrusion and each complaint directly referenced Grand Design's slide-box as the cause of the water intrusion. MTD at 5; SAC at ¶¶ 32-35. At bottom, Grand Design wants the Court to blame its well-known water intrusion woes on Plaintiff's maintenance habits and mold spray regimen, and to dismiss this case as a result.

Grand Design's attempts to shift blame onto Plaintiff and other consumers, while simultaneously denying its knowledge of the Defect, is disingenuous. Here, Grand Design's executive leadership had actual knowledge of material information

concerning the Defect nearly a year before it sold Plaintiff his RV. *See, e.g.,* SAC at ¶ 6. Prior to Plaintiff's purchase, Grand Design's "face of its company," Bill Martin, then-Director of Marketing, received first-hand knowledge from at least four consumers that Grand Design's slide-box caused water intrusion. MTD at 5; SAC at ¶¶ 63-70. As Grand Design glosses over in its Motion (without identifying Mr. Martin by role or title, and without including the date that Grand Design received the complaints), Bill Martin responded and confirmed that Grand Design had received the complaints and was actively working to resolve the problem. SAC at ¶¶ 64-65, 67, 70. Grand Design was repeatedly placed on notice of the water intrusion caused by the Defect sometime in early 2017, long before Plaintiff purchased his RV. SAC at ¶¶ 64-70.

Notably, in a farewell Facebook post created by Tom Holt (current-Marketing Communications Manager at Grand Design), Holt described Bill Martin's critical role at Grand Design. Tom Holt's post was uploaded to Grand Design's Owners Forum and Grand Design Owners' Facebook Group. The post appears below without grammatical or typographical alteration. *Id.*

> Bill was the face for 1200 team members who also drank the Kool-aide and wake up everyday and come to work towards the goal of creating customers for life. What Bill in his role of Director of Marketing really did was assisted in the communication between you and the rest of the team he was a bridge. It was still the customer service team or sales team that got you the answers, or resolved your problem.[2]

---

[2] https://www.mygrandrv.com/forum/showthread.php/16648-Bill-Martin (last visited Sept. 28, 2021).

*Id.* Oddly, Grand Design's Motion attempts to limit the scope and reach of authority that Bill Martin possessed at Grand Design. Grand Design ignores Martin's involvement and withholds that Martin responded to all four water intrusion complaints made in early 2017. Unlike Grand Design's Motion, Tom Holt paints a powerful picture of Grand Design's internal structure and communication channels and offers insight into the Grand Design departments that would have immediately learned about the Defect in early 2017. *Id.* Based on Tom Holt's admissions, once Bill Martin had received each of the four above-mentioned complaints, he would have immediately notified Grand Design's customer service team and sales team to assist its customers with addressing water intrusion concerns. *Id.*

No matter what the legal theory, the passage of time has revealed that Grand Design has done nothing to cure the Defect (as it guaranteed that it would in its warranty), and Grand Design has failed to disclose the Defect to consumers on its website and in its marketing materials. As the parties conduct further discovery, Grand Design's failures and inaction will become even more evident. At the pleading stage, however, all that is required is enough to put Grand Design on notice of the claims being asserted. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiff's Complaint easily crosses this threshold.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On October 10, 2017, Plaintiff Gregory Gorecki purchased a brand new 2018 Grand Design Imagine 2600 RB Travel Trailer (the "RV") for $29,300. SAC at ¶

28. Plaintiff purchased the RV through Grand Design's authorized dealer, Lazydays RV of Tampa ("Lazydays"). *Id.* Grand Design's website expressly directs consumers in the Tampa area to purchase its RVs at Lazydays. SAC at ¶ 29. Plaintiff first reported a pink discoloration in the flooring of the RV to Lazydays on July 9, 2018; he had only first noticed the pink discoloration a few days prior. SAC at ¶ 30. Plaintiff had not noticed any visible leaks or water intrusion in the RV. *Id.* Lazydays blamed the pink discoloration in the flooring on improper glue used in the RV and noted "floor is turning pink by the emergency window-customer has not seen any water leaks." SAC at ¶ 31. Lazydays did not take any further steps to repair the RV because it purportedly did not believe that the pink discoloration in the flooring was related to water intrusion. *Id.* In reality, the pink discoloration stems from the actinomycete bacterial genus, *Streptomyces*, which is well known in the RV and marine industries.

Less than a year later, on June 17, 2019, Plaintiff returned to Lazydays with complaints that the RV's pink discoloration in the flooring had increased. SAC at ¶ 32. Lazydays' investigation revealed a saturated floor, water intrusion, and mold damage. SAC at ¶ 33. Over the next year, Plaintiff and Grand Design hired four different experts: Lazydays (Grand Design's authorized dealer), ServPro (mold remediation and restoration), Luce Air Quality (mold assessment), and John Cotton (pressure testing for leaks)—to conduct testing and attempt to resolve the water intrusion issues caused by the Defect. SAC at ¶¶ 34-41, 46-49. None of the experts successfully resolved the Defect. SAC at ¶¶ 50,

53. As Grand Design recognizes in its Motion, none of the experts hired by Plaintiff or Grand Design ever discovered visible water intrusion, only the resulting damage. MTD at 4. Undeniably, the Defect caused Plaintiff's water damage and subsequent mold progression. SAC at 11-30.

Thereafter, Plaintiff sent a certified letter to Grand Design explaining that the mold had returned and demanding a full refund. SAC at ¶ 50. Plaintiff and Grand Design briefly exchanged emails and Plaintiff provided Grand Design with several photographs showing extensive mold growth. SAC at ¶¶ 50-54. On January 18, 2021, Grand Design's customer relations representative informed Plaintiff that his three-year structural warranty had expired and directed Plaintiff to contact ServPro. SAC at ¶ 54. Grand Design's actual customer relations response is vastly different from the narrative depicted in its Motion. MTD at 4. More specifically, Grand Design asserts that it "never refused a repair request"—but this assertion is blatantly contradicted by Grand Design's email to Plaintiff dated January 18, 2021, which stated that the prior remediation was "a one-time goodwill" and "one time assistance," and explained that "[t]he three year structural warranty expired in October 2020." SAC at ¶ 54.

Importantly, Grand Design does concede that customers' water intrusion issues appear in several different forums. MTD at 5. In Plaintiff's Complaint he submits four customer complaints dated early 2017, along with the responses that Bill Martin (then-Director of Marketing at Grand Design) provided to each customer. SAC at ¶¶ 63-70. Grand Design refutes these complaints without

reference to the date that Grand Design received the complaints, without providing any explanation of what action it undertook in response, and without acknowledging the uniformity of the complaints. MTD at ¶ 5.

Grand Design's arguments are intended to distract, not inform. In barely two sentences, Grand Design attempts to distinguish Plaintiff's water intrusion defect from the four other complaints that it received in early 2017 that involved identical water intrusion. Grand Design concludes that essentially none of the four complaints mentioned discolored flooring or mold, and one of the complaints was not made by an owner. *Id.*. These excuses are nothing more than a pink herring— Grand Design's senior management team possessed knowledge of the Defect nearly a year before Plaintiff purchased his RV. *Id.*

After Grand Design flatly refused to help him, Plaintiff filed his Complaint on April 29, 2021, alleging claims for Breach of Express Warranty, Violation of the Magnusson-Moss Warranty Act, Breach of Implied Warranty, and Violation of Florida's Deceptive and Unfair Trade Practices Act. Following the filing of Plaintiff's Second Amended Complaint, Grand Design filed the instant Motion.

## III.   APPLICABLE LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id.* (internal citation omitted). "When there are well pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

## IV. ARGUMENT

### A. Plaintiff Asserts Valid Express Warranty Claims

Ignoring the liberal notice pleading standard applicable on motions to dismiss, Grand Design urges dismissal of Plaintiff's express warranty claim on the basis of multiple unavailing arguments. In so doing, Defendant seeks to impose burdens that common sense and the case law do not permit. Among other things, Defendant attempts to conflate the summary judgment and post-trial standards with those applicable on a motion to dismiss, relying on numerous cases decided on a complete factual record. Tellingly, in support of Defendant's arguments for dismissal of the express warranty claim, Grand Design cites just three federal cases from Florida, one of which was a summary judgment decision, while the other two were post-trial decisions. As set forth herein, this Court should deny Defendant's motion to dismiss the express warranty claim and permit Plaintiff to develop a complete factual record through the discovery process.

### 1. Plaintiff's Complaint Satisfies the Elements of a Florida Express Warranty Claim

Perhaps in an effort to distract the Court from the well pleaded allegations of the complaint, Defendant fails to identify the elements of a claim for breach of express warranty—the proper starting point of the Court's analysis.

> In order to properly plead a cause of action for breach of warranty under the Florida Uniform Commercial Code, a complaint should contain at least the following allegations: (1) the sale of goods; (2) the warranty under which relief is sought; (3) how the warranty arose; (4) the breach of the warranty; (5) notice to the seller of the breach; (6) and the injury sustained by the buyer.

*E-Z Pack Mfg., LLC v. RDK Truck Sales & Serv.*, No. 8:10-cv-1870-T-27AEP, 2011 U.S. Dist. LEXIS 97274, at *20 (M.D. Fla. Aug. 10, 2011) (citing *Dunham-Bush, Inc. v. Thermo-Air Serv., Inc.,* 351 So. 2d 351, 353 (Fla. 4th Dist. Ct. App. 1977). Each of the elements of an express warranty claim are included within Plaintiff's operative complaint.

Plaintiff's complaint identifies, with specificity, the goods sold. *See* SAC at ¶ 28. Plaintiff identifies, with specificity, the warranty under which relief is sought. *Id.* at ¶ 25. Plaintiff identifies the transaction and manner in which the warranty arose. *Id.* at ¶¶ 25-28. Plaintiff identifies in detail the entire history of the breach. *Id.* at ¶¶ 25-54. Plaintiff further details the notice of the breach and even provides the precise communications at issue as well as photos shared with Defendant. *Id.* Finally, Plaintiff details the injury sustained and ongoing problems in words and photographs. *See, e.g.*, SAC at ¶¶ 56-57. This is all that the law requires of Plaintiff, and his detailed 71-page Second Amended Complaint easily satisfies this burden.

### 2. Factual Disputes Cannot Be Resolved on a Motion to Dismiss

Rather than permitting Plaintiff the opportunity to develop a factual record, Defendant asks the Court to improperly resolve factual disputes on a motion made pursuant to Rule 12. Defendant selectively quotes from the complaint and ignores the factual allegations that it finds disadvantageous.

For example, Plaintiff's complaint expressly alleges a breach of the Three-Year Limited Structural Warranty specifying that "[t]he Defect constitutes a 'defect[] in materials and/or workmanship' in the sidewall frame assembly and other Structural Components by virtue of the Slide-Box allowing water to intrude into the RV." SAC at ¶ 26. Despite numerous photos and pages of explanation, Defendant contends that this claim is not specific enough. MTD at 7.

Similarly, Defendant attempts to parse the warranty, hoping to exploit some technical deficiency in Plaintiff's description of his protracted efforts to address the Defect and seek assistance from Grand Design. *Id.* Defendant likewise claims that Defendant did not actually refuse his request for assistance despite stating twice in its final email that the prior assistance was a one-time good will gesture and expressly telling Plaintiff that his warranty had expired. SAC at ¶ 54. Defendant's revisionist history must be disregarded. This *post hac* legalistic prevarication represents, at best, a factual dispute.

The pleading of the complaint is not a game of "gotcha" and a Rule 12 motion is not the appropriate means of parsing factual disputes. *Trinity Graphic, USA,*

*Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018) ("questions of fact [] cannot be resolved on a motion to dismiss"). As the Supreme Court has made clear, "[i]f a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56. The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

If Defendant did not understand the allegations of the complaint, it was free to seek a more definite statement under Rule 12(e). Defendant chose not to seek such a statement. And if Plaintiff's claims lacked merit (to be clear—they do not), nothing prevents Defendant from moving for summary judgment at the appropriate juncture. But Plaintiff has met his burden to make a plausible claim for violation of the express warranty, and Plaintiff is therefore entitled to secure discovery and litigate his case.

### B. Plaintiff Asserts Valid Implied Warranty Claims

Next, Defendant argues that Plaintiff's implied warranty claim fails because Plaintiff was not in privity with Grand Design, but instead with the company Grand Design's website expressly directed Plaintiff to purchase from. SAC at ¶¶ 29, 58. As such, Defendant argues that Plaintiff cannot assert implied warranty claims against Grand Design. This argument is not based on sound reasoning, and it

ignores the fact that Plaintiff is the recipient of Grand Design's warranty and is an intended third-party beneficiary. For example, paragraph 119 of the SAC states:

> Nonetheless, privity is not required here because Plaintiff and each of the other members of the Class are intended third-party beneficiaries of contracts between Grand Design and its dealers, and specifically, of their implied warranties. The dealers were not intended to be the ultimate users of the RVs and have no rights under the warranty agreements provided with the RVs; the warranty agreements and representations incident thereto were designed for and intended to benefit purchasers of the RVs.

When, as here, plaintiffs are intended third party beneficiaries, courts in Florida have found an exception to privity requirements "when a manufacturer directly provides a warranty to, or otherwise has direct contact with, a buyer who purchases from a third party." *See Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017); *see also Pegasus Aviation IV, Inc. v. Aircraft Composite Techs., Inc.*, No. 1:16-cv-21255-UU, 2016 U.S. Dist. LEXIS 79397, at *15 (S.D. Fla. June 17, 2016) ("Plaintiff can state a claim for breach of express warranty and breach of implied warranty of merchantability, even without direct privity, as long [as] Plaintiff adequately alleges that it was a third party beneficiary of the contract for the sale of the thrust reversers."); *Sanchez-Knutson v. Ford Motor Co.*, 52 F. Supp. 3d 1223, 1233-34 (S.D. Fla. Oct. 7, 2014) ("Plaintiff can pursue a claim of breach of implied warranty through third-party beneficiary law."); *Ohio State Troopers Ass'n v. Point Blank Enters.*, No. 0:17-cv-62051-UU, 2018 U.S. Dist. LEXIS 59141, at *22 (S.D. Fla. Apr. 5, 2018) ("Plaintiffs have also properly alleged privity as third-party beneficiaries.").

The sound reasoning and analysis in the foregoing cases applies with equal force here where Plaintiff received information directly from Defendant and was the intended beneficiary of the warranty as the direct purchaser of a new RV. These cases provide a clear basis for Plaintiff's implied warranty claims, and, as such, Defendant's motion to dismiss Plaintiff's implied warranty claims should be denied.

### C. Plaintiff Pleads a Viable Claim Under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

#### 1. Defendant's Disclosure Does Not Negate its Unfair or Deceptive Conduct

Interestingly, Defendant's first argument against Plaintiff's FDUTPA claim starts by admitting that "the GDRV and the Owner's Manual disclosed that water may intrude into the slide room through the bottom corners." MTD at 18. Defendant then argues that this disclosure precludes any FDUTPA claim because there was no undisclosed material fact which could have harmed Plaintiff or the class.

Putting aside that Defendant is now admitting that it knew that "water may intrude through the slide room," the disclosure stops far short of the mark because it implies that the water intrusion was known, minimal and manageable through the product's design. It did not disclose that the water problems caused by the Defect would require the entire floor to be replaced and would cause mold to constantly grow within the RV. Since such disclosures were never made, this first argument fails easily.

## 2. No "Knowledge" is Required under FDUTPA

Defendant's second FDUTPA argument is that Plaintiff failed to show that Defendant knew of the Defect prior to his purchase. "Essential to Plaintiff's claim is the allegation that GDRV had knowledge of this 'defect' before his purchase" (MTD at 19). In support of this creative interpretation, Defendant cites to *Matthews v. Am. Honda Motor Co., Inc.*, No. 12-60630-civ-WILLIAMS, 2012 U.S. Dist. LEXIS 90802, at *7-8 (S.D. Fla. June 6, 2012), which does recognize that a FDUTPA claim can arise when a defendant knowingly fails to disclose a defect. But the *Matthews* court does not say that knowledge is required for all FDUTPA claims. In fact, the *Matthews* court fails to conduct any analysis of the knowledge element as a prerequisite to any FDUTPA claim, as argued by Defendant here. *Id.*

It appears that a California trial court likewise failed to closely review *Matthews* when it relied on this same quote, without more, as its basis for dismissing a FDUTPA claim against Hyundai in California because the plaintiff failed to show "knowledge" of the defect. *See Resnick v. Hyundai Motor Am., Inc.*, No. cv 16-00593-BRO (PJWx), 2017 U.S. Dist. LEXIS 139179, at *58 (C.D. Cal. Aug. 21, 2017). But the *Resnick* court also failed to conduct any analysis beyond simply stating the quote from *Matthews*.

By contrast, the Court in *Lewis v. Mercedes-Benz USA, LLC*, No. 19-civ-81220-RAR, 2021 U.S. Dist. LEXIS 60557, at *82-87 (S.D. Fla. Mar. 30, 2021), conducted a thorough review of FDUTPA law before deciding that, unlike California's Unfair Competition Law, there is no "knowledge" requirement under

FDUTPA. Although Defendant mentions *Lewis* in a footnote, it does so as merely "a recent Southern District decision" which "**dispensed** with the knowledge requirement." (MTD at 19, n.3) (emphasis supplied). However, a closer review of *Lewis* shows that the Court did not "dispense" with anything. Instead, it conducted a careful review of both federal and Florida Supreme Court precedent before clarifying what the law *has always been*:

> Apart from reliance, there is another element of fraud that need not be shown in a FDUTPA claim, and that element happens to have a dispositive impact on Plaintiffs' FDUTPA claim here: knowledge that the act was deceptive. . . .
>
> A review of the statute, as interpreted by the Florida Supreme Court, makes clear that knowledge of a deceptive act is not required to state a claim under FDUTPA. "The Florida Supreme Court teaches that a deceptive act occurs when 'there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.' Thus, the Act focuses on whether an act is deceptive, not whether a defendant knew that the allegedly violative conduct was occurring." *Gavron*, 819 F. Supp. 2d at 1302 (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003)).

*Lewis,* 2021 U.S. Dist. LEXIS 60557 at *83-85; *see also Orkin Exterminating Co. v. Federal Trade Comm'n,* 849 F.2d 1354, 1368 (11th Cir. 1988) (stating, in the context of a Federal Trade Commission Act violation case, "[g]iven that a practice may be deceptive without a showing of intent to deceive, it is apparent that a practice may be found unfair to consumers without a showing that the offending party intended to cause consumer injury"). Because a plaintiff need not show that

a defendant had knowledge of the alleged defect to assert a FDUTPA claim, Defendant's second argument also fails.

### 3.  Plaintiff's FDUTPA Claim is Distinguishable From His Warranty Claims

Defendant's third argument is that Plaintiff's FDUTPA claim must be dismissed because it is simply a breach of warranty claim in disguise. In support of this position, Defendant cites cases in which the plaintiff asserted that the act of breaching a contract constituted a FDUTPA violation. But these cases are easily distinguished.

For example, in *Rebman v. Follett Higher Educ. Grp., Inc.*, 575 F. Supp. 2d 1272 (M.D. Fla. 2008), the plaintiffs attempted to claim that the act of breaching a contract was an unfair or deceptive practice. The court examined this theory and found that it was "precisely the type of breach of contract claim that cannot be converted to a claim under the FDUTPA." *Id.* at 1279. The distinction that the court drew was that there was no separate act beyond the breach of contract that could be considered unfair or deceptive. "Florida law does not prohibit [plaintiffs] from pursuing a separate FDUTPA claim related to Follett's alleged breach of the Agreement, so long as the act giving rise to the breach *also constitutes* an alleged unfair or deceptive trade practice." *Id. See also PNR, Inc.*, 842 So. 2d at 777 (an unfair practice can be any one "offends established public policy" or that is "immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers").

Here, Plaintiff alleged that Defendant sells its Imagine Series RVs which suffer from the Defect that causes water to intrude upon the interior causing water damage and mold. At no point did Defendant disclose that the water intrusion problems associated with the Defect would cause mold to grow inside the RV, making the RV unsafe to use and worth substantially less. Because this information was not disclosed up front, Plaintiff did not receive the benefit of his bargain. Similar claims have been repeatedly found to constitute a valid FDUTPA claim. *See, e.g., Lewis,* 2021 U.S. Dist. LEXIS 60557 at *90-91 (FDUTPA claim for benefit of bargain damages for defective headrests); *Collins v. DaimlerChrysler Corp.*, 894 So.2d 988 (Fla. 5th Dist. Ct. App. 2004) ("actual damages," within meaning of FDUTPA, are difference between market value of product or service in condition in which it was delivered, and its market value in condition in which it should have been delivered according to contract of parties); *Matthews*, 2012 U.S. Dist. LEXIS 90802 at *7-8 (the plaintiff in a FDUTPA case must simply show that the defect diminishes the product's value such that the failure to disclose the defect would be likely to mislead a consumer acting reasonably at the time of purchase).

Plaintiff is not asserting that it was unfair and deceptive for Defendant to breach its warranty. Instead, he is arguing that because the Defect was not disclosed, he did not receive the benefit of the bargain and he received an RV that is worth less than what he paid or would have paid had the defect been disclosed. *See, e.g.*, *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689, 692 n.2 (S.D. Fla. 2010) ("Ostensibly, a deceptive practice allows a manufacturer or vendor to

charge a premium for a product that the manufacturer would not be able to command absent the deceptive practice. Thus, even if an individual consumer does not rely on a deceptive practice when deciding to purchase that product, the consumer will have paid more for the product than she otherwise would have. Consequently, the consumer suffers damages."). In sum, this case is distinguishable from the narrow line of cases cited by Defendant, and Plaintiff's FDUTPA claim should be sustained.

### D. Dismissing Plaintiff's National Allegations is Premature

Defendant argues that Plaintiff lacks standing to assert 'nationwide' warranty claims under Counts I and II. However, this argument runs contrary to the stated purpose of the Class Action Fairness Act ("CAFA"). CAFA grants "original jurisdiction" to district courts over class actions in which the amount in controversy exceeds $5,000,000 and where "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332. Its aim was to encourage the efficient litigation of national class actions in federal courts, allowing multi-state class actions and class actions raising issues of national importance into federal courts. Shortly after CAFA was passed, the Eleventh Circuit addressed CAFA's scope, concluding that CAFA's broad scope applied to all claims and all parties:

> Congress intended CAFA to encourage the litigation of certain class actions—"cases of national importance"—in federal courts, so as to minimize bias against out-of-state defendants and promote the fair application of state law to the multifarious parties in class actions. CAFA § 2, 119

> Stat. at 5. As in the case of §1441(d), CAFA's purposes encourage a reading that makes more inclusive the scope of its removal provisions, not less inclusive. In light of that expansive construction of the removal provisions, we conclude that the district court erred in holding that the pre-CAFA defendants were not properly included in Alabama Power's removal. Because we read CAFA's jurisdictional and procedural removal provisions to relate to the "class action" and not particular claims, the removal of the claims against all the defendants either stands or falls as a whole.

*Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1197 (11th Cir. 2007) (emphasis added).

In other words, regardless of what claims are advanced, the size of the class alleged, or the citizenship of each named plaintiff, the entire "civil action" is within the original jurisdiction of the federal court under CAFA. *See Standard Fire Ins. Co. v. Knowles*, 133 S. Ct. 1345, 1350 (2013) ("CAFA's primary objective" is to "ensur[e] 'Federal court consideration of interstate cases of national importance.'"); S. Rep. No. 109–14, at 43 (2005) (stating that CAFA's "provisions should be read broadly, with a strong preference that interstate class actions should be heard in a federal court if properly removed by any defendant.").

Defendant's position would effectively extinguish all nationwide consumer class actions at the motion to dismiss stage that did not include at least 51 class representatives (50 states and the District of Columbia), in stark contradiction to the purpose of CAFA and Rule 23. Under Defendant's theory, a nationwide class action would be replaced by a patchwork of multi-district litigation, requiring the inefficient filing of multiple separate actions in each plaintiff's home state. This would likely result in motions to transfer by defendants, consolidating those

actions back to a single court to avoid the risk of inconsistent adjudications and to conserve judicial resources. Taken to its logical conclusion, this reasoning appears to also ask federal courts to analyze personal jurisdiction as to the claims advanced by all non-resident putative class members, even that which could be consolidated in MDL proceedings at the motion to dismiss stage. "[I]mposing such a requirement would turn-upside down the multidistrict litigation statute's goal of promoting the 'convenience of parties and witnesses' and the 'just and efficient conduct' of consolidated actions. 28 U.S.C. § 1407(a)." *In re Takata*, 396 F. Supp. 3d 1101, 1136 (S.D. Fla. 2019). Such piecemeal litigation and forum shopping by Defendant must be rejected.

### E. CAFA Provides Plaintiff an Alternative Basis for Jurisdiction Under the Magnuson-Moss Warranty Act ("MMWA")

Defendant concedes that Plaintiff's operative Complaint meets CAFA's requirements. This concession means that the MMWA claim must also survive Defendant's Motion. While there is a Circuit split at the intersection of CAFA and the MMWA, Plaintiff possesses the stronger argument.

Under the MMWA, "[no] claim shall be cognizable" if it is a class action brought in a district court and contains fewer than 100 named plaintiffs. § 2310(d)(3). In recent court opinions, district courts are integrating CAFA—the newer of the two statutes—with the MMWA, holding that "as a firmly embedded principle of statutory construction requires courts to presume that Congress enacts legislation with knowledge of existing law and, consequently, the newly-enacted

statute is harmonious with existing law." *McCalley v. Samsung Elecs. Am., Inc.*, No. 07-2141 (JAG), 2008 U.S. Dist. LEXIS 28076, at *12 (D.N.J. Mar. 31, 2008) (interpreting this statute as logical in "light of the fact that CAFA's legislative history clearly indicates the congressional intent to expand federal jurisdiction over class actions.").

The MMWA's House Report 93-1107 reveals that "Section [2310] (d) should be construed reasonably to authorize the maintenance of a class action," with the drafters "emphasiz[ing] that this section is remedial in nature and is designed to facilitate relief that would otherwise not be available as a practical matter for individual consumers." *See* H. Rep. 93-1107; *see also* Sarah T. Lepak, *Federal Jurisdiction Under the Magnuson-Moss Warranty Act*, 52 Kan. L. Rev. 1041, 1054-55 (2004).

Since CAFA was enacted in 2006, at least two dozen courts have permitted CAFA to bypass the named plaintiff requirement of the MMWA.[3] Notably, several

---

[3] *See Chavis v. Fidelity Warranty Services, Inc.,* 415 F. Supp. 2d 620, 626 (D.S.C. 2006); *Stella v. LVMH Perfumes and Cosmetics*, 564 F. Supp. 2d 833, 837-38 (N.D. Ill. 2008); *McCalley,* No. 07-2141 (JAG), 2008 U.S. Dist. LEXIS 28076, 2008 WL 878402, at *5 (D.N.J. Mar. 31, 2008); *Birdsong v. Apple, Inc.,* 590 F.3d 955, 957 n.1 (9th Cir. 2009); *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012); *Payne v. Fujifilm U.S.A., Inc.,* No. CIV.A. 07-385 (JAG), 2007 U.S. Dist. LEXIS 94765, 2007 WL 4591281, at *7 (D.N.J. Dec. 28, 2007); *McGee v. Continental Tire North Am., Inc.,* No. CIV.06-6234 (GEB), 2007 U.S. Dist. LEXIS 62869, 2007 WL 2462624, at *2-3 (D.N.J. Aug. 27, 2007); *Clark v. Wynn's Extended Care,* No. 06 C 2933, 2007 U.S. Dist. LEXIS 27386, 2007 WL 922244, at *4-5 (N.D. Ill. Mar. 23, 2007); *McWhorter v. Elsea, Inc.,* 2007 U.S. Dist. LEXIS 26914, 2007 WL 1101249 (S.D. Ohio April 11, 2007); *Brothers v. Hewlett-Packard Co.*, No. C-06-02254, 2007 U.S. Dist. LEXIS 13155, 2007 WL 485979 (N.D. Cal. Feb. 12, 2007); *Kuns v. Ford Motor Co.*, 543 F. Appx 572 (6th

courts have determined that the later-passed CAFA "can render a district court a 'court of competent jurisdiction' and permit it to retain jurisdiction where the CAFA requisites are met, but the MMWA requisites are not." *Kuns*, 6th Cir. at 574 (determining that CAFA was meant to create another avenue for federal court jurisdiction, and that "CAFA effectively supersedes the MMWA's more stringent jurisdictional requirements"); *Weisblum v. Prophase Labs, Inc.*, 88 F. Supp. 3d 283, 293 (S.D.N.Y. 2015); *Chavis v. Fid. Warranty Servs., Inc.*, 415 F. Supp. 2d 620, 626 (D.S.C. 2006); *Keegan v. Am. Honda Motor Co., Inc.*, 838 F. Supp. 2d 929, 954 (C.D. Cal. 2012) (connecting cases and noting "[t]hese cases hold that where the party invoking federal jurisdiction is able to meet his or her burden of proving jurisdiction under CAFA, the absence of at least one hundred named plaintiffs does not prevent the plaintiff from asserting claims under the Magnuson-Moss Warranty Act."); *accord* 9 Bus. & Com. Litig. Fed. Cts. § 101:135 (3d ed.).

The Court in *Kuns* based its reasoning on *Keegan v. Am. Honda Motor Co.*, which held that as a "general rule" the CAFA effectively supersedes the MMWA's more stringent jurisdictional requirements. Defendant's Motion references three cases as a basis for dismissing Plaintiff's claims under the MMWA. MTD at 26. In comparison with the weight of the authority in more than two dozen cases cited

---

Cir. 2013); *In re Scotts EZ Seed Litig.*, No. 12 CV 4727 (VB), 2013 U.S. Dist. LEXIS 73808 (S.D.N.Y. 2013); *Route v. Mead Johnson Nutrition Co.*, No. 12-7350-GW, 2013 U.S. Dist. LEXIS 35069 (C.D. Cal. Feb. 21, 2013); *Dye v. Bodacious Food Co.*, No. 14-80627, 2014 U.S. Dist. LEXIS 180826 (S.D. Fla. Sept. 9, 2014); *Weisblum v. Prophase Labs*, Inc., 88 F. Supp. 3d 283 (S.D.N.Y. 2015).

above, Defendant's three cases merely evidence the split amongst the federal circuits. *Id.* Plaintiff is unaware of any decision where the Eleventh Circuit has limited MMWA class actions to only those meeting the text of the statute rather than those meeting CAFA's requirements. This is a logical approach as the 100-plaintiff requirement would eliminate many of CAFA's efficiencies, potentially requiring document discovery and depositions from 100 plaintiffs.

Because Defendant concedes that Plaintiff meets CAFA's jurisdictional requirements, the Court should allow Plaintiff to proceed under CAFA as a basis for alternative jurisdiction under the MMWA.

## V. CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant's motion to dismiss in its entirety.

Dated: September 28, 2021              Respectfully submitted,


**VARNELL & WARWICK, P.A.**

/s/ Brian W. Warwick
Brian W. Warwick; FBN: 0605573
Janet R. Varnell; FBN: 0071072
Matthew T. Peterson, FBN: 1020720
Erika Willis, FBN: 100021
1101 E. Cumberland Ave., Suite 201H, #105
Tampa, Florida 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jvarnell@varnellandwarwick.com
bwarwick@varnellandwarwick.com
mpeterson@varnellandwarwick.com
ewillis@varnellandwarwick.com
kstroly@varnellandwarwick.com

William H. Anderson (*pro hac vice*)
wanderson@hfajustice.com
**HANDLEY FARAH & ANDERSON PLLC**
4730 Table Mesa Drive
Suite G-200
Boulder, CO 80305
Telephone: (303) 800-9109
Facsimile: (844) 300-1952

Stephen Pearson (*pro hac vice*)
spearson@hfajustice.com
**HANDLEY FARAH & ANDERSON PLLC**
200 Massachusetts Avenue, NW
Seventh Floor
Washington, DC 20001
Telephone: (202) 921-4567
Facsimile: (844) 300-1952

Christopher J. Brochu
c.brochu@brochulaw.com
Fl. Bar. No.: 1013897
**BROCHU LAW, PLLC**
841 Prudential Drive, Suite 1200
Jacksonville, Florida 32207
Telephone: (904) 201-1771

*Attorneys for Plaintiff Gregory Gorecki and the proposed class.*